**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES RICHARD THOMAS, | CASE NO. 5:22-CV-01937 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff James Richard Thomas ("Plaintiff" or "Mr. Thomas") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.      Procedural History

Mr. Thomas filed his DIB and SSI applications on June 3, 2020.  (Tr. 13, 196-202, 203-09.)  He alleged a disability onset date of October 31, 2017.  (Tr. 13, 196, 203.)  He alleged disability due to: multiple sclerosis ("MS"); vision loss; hip, back, and shoulder arthritis; depression; and heart attack.  (Tr. 115, 126, 219.)  After initial denial by the state agency (Tr. 111-20) and denial upon reconsideration (Tr. 122-29), Mr. Thomas requested a hearing (Tr. 130-31).  A video hearing was held before an Administrative Law Judge ("ALJ") on June 9, 2021.

1

(Tr. 30-69.)  The ALJ issued an unfavorable decision on September 7, 2021, finding Mr. Thomas

not disabled.  (Tr. 10-29.)  The Appeals Council denied Mr. Thomas's request for review of the

ALJ's decision on August 26, 2022, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-6.)  Mr. Thomas then filed the pending appeal.  (ECF Doc. 1.)  The matter

is fully briefed.  (ECF Docs. 9 & 13.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Thomas was born in 1968 and was forty-nine years old on the alleged disability onset

date.  (Tr. 23, 196, 203.)  He has a high school education.  (Tr. 23, 41.)  He was honorably

discharged from his service in the Army and last worked full-time in 2017.  (Tr. 42.)  His past

work included work as a heavy equipment operator and excavating supervisor / heavy equipment

operator (Tr. 42-45, 60.)

### B.      Medical Evidence

#### 1.      Relevant Treatment History

On September 26, 2017, Mr. Thomas had x-rays taken of his right shoulder and thoracic

and lumbosacral spine due to pain.  (Tr. 431-33.)   The x-rays revealed degenerative changes in

the right shoulder and thoracic spine, and degenerative changes, osteopenia, and scoliosis and

pelvic tilt in the lumbar spine.  (*Id*.)

On March 2, 2018, Mr. Thomas presented to nurse practitioner Christina M. Christopher

at the Department of Veterans Affairs (VA) for a primary care appointment.  (Tr. 561-64.)  He

complained of pain in his shoulders and right hip and numbness in his hands.  (Tr. 562.)  Other

noted concerns were coronary artery disease, tinnitus, Barretts esophagus, and osteoarthritis.

(*Id*.)  He reported that he had stopped working and had applied for disability.  (*Id*.)  He said he

had tried gabapentin without relief, and had also tried Flexeril and Tylenol.  (*Id*.)  On physical examination, Mr. Thomas had increased pain in the right hip with adduction and abduction.  (Tr. 563.)  NP Christopher recommended physical therapy for Mr. Thomas's pain-related complaints and ordered right hip x-rays.  (*Id*.)

On September 24, 2018, Mr. Thomas had an MRI of his hip.  (Tr. 349.)  The MRI revealed a subchondral cyst and degenerative changes.  (*Id*.)  An orthopedic consult at the VA in October 2018 was discontinued in December 2018 after Mr. Thomas missed appointments or did not follow up to schedule appointments.  (Tr. 468-69.)

On June 4, 2019, Mr. Thomas presented to clinical psychologist Laura Yahney at the VA for a psychological assessment.  (Tr. 541-43, 544-45.)  He reported terminating a relationship that was not good for him, and said that he was interested in therapy to "make positive changes in his life."  (Tr. 542.)  He said that his priority was to "re-establish a strong relationship with his son."  (*Id*.)  On mental status examination, he was alert, attentive, cooperative, and reasonable.  (*Id*.)  His speech was normal, his thought processes were normal and coherent, and his language and memory were intact.  (*Id*.)  His mood was euthymic, and his affect was congruent with his mood.  (*Id*.)  He had no unusual thought content or perceptual disturbances, and no suicidal ideation.  (*Id*.)  Mr. Thomas was diagnosed with anxiety and depression, but psychologist Yahney noted that he appeared "motivated and willing to work on himself."  (Tr. 543.)  She recommended that Mr. Thomas attend therapy twice per month to help him gain confidence with decision making.[1]  (*Id*.)

---

[1] Neither party cites to additional mental health treatment notes.  However, there are references to a few telephone mental health encounters in June 2019 (Tr. 595-96.)  During Mr. Thomas's consultative evaluation conducted by Vernon Brown, Ph.D., in September 2020, he "denied any current or recent mental health treatment." (Tr. 734.)  He said that he saw a psychiatrist once at the VA "for relationship issues when he was getting divorced," and after "he vented for about 30 minutes," he "felt better and did not require any more treatment." (*Id*.)  He "denied any other history of mental health treatment," and denied "ever having received any inpatient psychiatric treatment." (*Id*.)

On March 27, 2020, Mr. Thomas was admitted to Mercy Medical Center for gradually worsening visual disturbance that had been occurring for three weeks.  (Tr. 284-346.)  An MRI of the brain showed changes that were suggestive of multiple sclerosis.  (Tr. 287.)  He was discharged on March 30, 2020, with a referral for long-term neurology follow up.  (Tr. 284.)

Mr. Thomas presented to Melinda Bond, APRN, CNP, at the NeuroCare Center (NeuroCare) for a telemedicine visit on April 9, 2020, for MS.  (Tr. 374-77.)  On physical examination, he was alert and in no acute distress.  (Tr. 375.)  He was oriented to person, place, and time and his speech, language, and fund of knowledge were normal.  (*Id*.)  Mr. Thomas was diagnosed with MS and CNP Bond started him on Aubagio.  (Tr. 376.)

On May 20, 2020, Mr. Thomas presented to Andrew Stalker, M.D., at NeuroCare for follow up.  (Tr. 652-55.)  He had started taking Aubagio.  (Tr. 652.)  He reported that his right eye was "still as blurry as it ever was"; he could see out of his right eye, but there was no detail.  (*Id*.)  On examination, he was in no acute distress and was alert and oriented to person, place, and time.  (*Id*.)  His speech, language, concentration, memory, and fund of knowledge were normal.  (Tr. 653-54.)  His motor strength and coordination were normal.  (Tr. 654.)  No tremors or involuntary movements were observed, but he exhibited mild problems with tandem gait.  (*Id*.)  He was continued on Aubagio and instructed to follow up in two months.  (*Id*.)

On July 22, 2020, Mr. Thomas returned to CNP Bond for follow up.  (Tr. 649-51.)  He reported that he felt fatigued, he was still not driving, and his vision was getting better but he was using readers.  (Tr. 650.)  He was having some pain in his ankles after first getting up, but the pain subsided after ten minutes.  (*Id*.)  He was tolerating Aubagio.  (*Id*.)  On examination, his speech and language were normal.  (*Id*.)

On August 11, 2020, Mr. Thomas presented to NP Christopher for a primary care follow up.  (Tr. 707-09; *see also* Tr. 1046-48.)  He complained of pain in his ankles when first getting up, pain in his left elbow, bilateral foot and shoulder pain, and fatigue.  (Tr. 708-09.)  When he first got up, his ankle pain felt like "needles" and like his ankles were on fire, but the feeling usually subsided about forty-five minutes after he got moving.  (Tr. 708.)  He said that he was told by providers at NeuroCare that his pain was likely due to his MS.  (*Id*.)  With regard to his elbow pain, he reported that he fell on his left elbow years earlier and thought he had a "floater bone" in his elbow that was causing him pain.  (*Id*.)  He also reported that his elbow pain had worsened after hitting his elbow a few days earlier.  (*Id*.)  He also reported that he was fatigued all the time and lacked motivation to do things.  (*Id*.)  On examination, he had limited range of motion in the shoulders bilaterally, right greater than the left, with crepitus to the right, and limited adduction in the right hip.  (Tr. 709.)  His strength was good in the bilateral upper extremities.  (*Id*.)  X-rays and lab work were ordered.  (*Id*.)

Also on August 11, 2020, Kelsey Meyer, an orthopedic physician assistant at the VA, reviewed a right hip x-ray and MRI of the hip from 2018.  (Tr. 702-03, 886.)  PA Meyer recommended a conservative course of treatment before considering surgery, consisting of pain management, physical and aqua therapy, and weight loss.  (*Id*.)  She also recommended an updated right hip x-ray.  (*Id*.)  PA Meyer's recommendations were relayed to Mr. Thomas by NP Christopher via telephone on August 12, 2020.  (Tr. 702, 885.)

On August 24, 2020, Mr. Thomas presented to Ali McHaourab, a physician at the VA, for his right hip pain.  (Tr. 700-01.)  The visit was conducted via telephone.  (Tr. 700.)  He reported that his hip pain was aggravated by activity, including standing, walking, and other physical activity like carpentry.  (Tr. 700-01.)  He reported discomfort when getting in and out of

the car, but not when going up steps.  (Tr. 701.)  Dr. McHaourab observed that Mr. Thomas was
alert, polite, and appropriate.  (*Id*.)  Stinchfield and FABER testing was negative on the left and
positive on the right.  (*Id*.)  Dr. McHaourab recommended a right hip injection and indicated that
he would refer Mr. Thomas to orthopedics if the injection did not help.  (*Id*.)

On October 26, 2020, Mr. Thomas returned to CNP Bond for a neurology follow up.  (Tr.
743-46.)  He reported that he was still unable to focus with his right eye.  (Tr. 744.)  He also
reported pain and a burning sensation in his feet and ankles after waking, and numbness in his
toes for two years.  (*Id*.)  He was working part-time doing carpentry work.  (*Id*.)  On
examination, his speech and language were normal.  (*Id*.)  CNP Bond continued Aubagio to treat
Mr. Thomas's MS and recommended physical activity "as able."  (Tr. 745.)

On November 18, 2020, Mr. Thomas presented to optometrist Ethan Wallace Leyda at
the VA for optic neuris / MS testing.  (Tr. 1025-30.)  He reported that he had been diagnosed
with MS since his last optometry visit and had undergone steroid treatment.  (Tr. 1025.)  The
steroid treatment had helped improve his vision, but he still had problems with vision in his right
eye.  (*Id*.)  He received a prescription for new glasses, but was advised that his vision would not
improve in the right eye.  (Tr. 1030.)

Mr. Thomas returned for a telemedicine neurology visit with CNP Bond on December
28, 2020.  (Tr. 1055-58.)  He reported falling two months earlier when he woke up in the middle
of the night to use the restroom (Tr. 1056), but also reported feeling much better and having
improved sensation since his primary care physician increased gabapentin to 300mg once a day.
(Tr. 1056, 1057.)  His speech was clear during the examination, but no other examination
findings were recorded because it was a virtual visit.  (Tr. 1057.)  CNP Bond continued Mr.
Thomas's MS medication.  (*Id*.)

On December 30, 2020, Mr. Thomas saw Dr. Leyda for an eye examination.  (Tr. 1112-15.)  Mr. Thomas's prescription was not changed.  (Tr. 1115.)

On April 26, 2021, Mr. Thomas presented to Emily Waight, PA, at NeuroCare for follow up regarding his MS.  (Tr. 1075-78.)  He complained of feeling "super fatigued" and "foggy" for two or three days every month, when he felt he could not do anything, but said those feelings had occurred "much more frequently" before his MS diagnosis.  (Tr. 1077.)  He denied new focal numbness / weakness, vision changes, falls, dysphagia, or spasms, but reported cognitive issues and bladder urgency.  (*Id*.)  He was trying to transfer his MS care to neurology at the VA due to insurance coverage issues.  (*Id*.)  Radiological studies completed on April 28, 2021, showed mild dextroscoliosis and mild degenerative changes in the upper thoracic spine (Tr. 1080-81), minimal spur formation in the right shoulder (*id*.), slight to mild narrowing of the superolateral aspect of the right hip (Tr. 1082), small spurs involving the superolateral aspect of the left acetabulum (*id*.), slight levoscoliosis of the lumbar spine (Tr. 1084), degenerative changes of the lumbar and lower thoracic spine (*id.*) and slight vascular calcifications in the lumbar spine (*id.*).

On May 6, 2021, Jennifer Jaquay with the VA called Mr. Thomas to review the results of his x-rays.  (Tr. 1102.)  Mr. Thomas informed her that he did not have time for physical therapy and stated he was "very active and [got] more exercise than most healthy people," reporting he had "walked 7 miles yesterday (walking through the woods)."  (Tr. 1103.)  She instructed him on home treatments for osteoarthritis and she asked if he would like information mailed to him. (*Id*.)  He declined the information, stating he would not read it anyway because of his vision. (*Id*.)  He said he was interested in an orthopedic consult, noting that his primary care physician had put an order in for one but he had not gone due to Covid.  (*Id*.)  He was now willing to go. (*Id*.)  He also expressed interest in a pain management consultation for hip injections.  (*Id*.)

Orthopedic and pain management consult requests were placed that day.  (Tr. 1093-94.)  With regard to the orthopedic consult, it was noted that orthopedics had been consulted three times, but Mr. Thomas did not keep the appointments.  (Tr. 1094.)

On May 11, 2021, Mr. Thomas attended a consultation with neurologist Alessandro Serra at the VA.  (Tr. 1154-58.)  He reported "fatigue, with episodes of extreme fatigue after he 'work[ed] too much for several days.'"  (Tr. 1156.)  He also reported difficulty with short-term memory and concentration, and urinary urgency.  (*Id*.)  He denied diplopia, bulbar symptoms, weakness, sensory loss, paresthesias, and Lhermitte's phenomenon.  (*Id*.)  On examination, he was alert and oriented to person, place, and time.  (Tr. 1157.)  He had normal language, attention and concentration, memory, and intellectual function.  (*Id*.)  His affect was normal, and he did not appear depressed.  (*Id*.)  His visual acuity in the right eye was 20/100, and 20/25 in the left.  (*Id*.)  His muscle strength and tone were normal, with generally normal reflexes.  (Tr. 1157-58.)  Coordination in the arms and legs was intact.  (Tr. 1158.)  His light touch, temperature, vibration, and proprioception were normal.  (*Id*.)  His standard gait was normal, but he had trouble with tandem gait.  (*Id*.)  Dr. Serra renewed Aubagio and his impression was that Mr. Thomas had "significant disease load and likely spine disease."  (*Id*.)  He ordered new imaging of the brain and cervical spine and referred Mr. Thomas to urology for "likely neurogenic bladder."  (*Id*.)

In June 2021, Mr. Thomas had new imaging of his hands, spine, and brain.  Hand x-rays taken on June 2, 2021, showed mild degenerative changes.  (Tr. 1179-80.)  A cervical MRI taken on June 14, 2021 (Tr. 1175-76), showed disc degeneration with disc bulging and mild to moderate bilateral neural foramen compromise (Tr. 1176).  A brain MRI also taken on June 14, 2021 (Tr. 1176-78), showed "[f]ew white matter hyperintense lesion some of which are oriented

perpendicular to the subependymal surface are likely due to chronic demyelinating lesions.  No enhancing lesion" (Tr. 1178).

On July 2, 2021, imaging of the right hip showed degeneration and osteoarthritis.  (Tr. 1169-70.)  That same date, Mr. Thomas had a right hip injection.  (Tr. 1170-72.)

A few days later, on July 6, 2021, Mr. Thomas presented to rheumatologist David Lang at the VA for a consult for his joint pain complaints.  (Tr. 1196-1208.)  He complained of: stiffness and swelling in his left hand / fingers; pain in his right hip; low back stiffness; and pain between his shoulder blades with a history of rotator cuff tears in his shoulders.  (Tr. 1197-98.)  On examination, there was trace pitting edema in the ankles bilaterally.  (Tr. 1200.)  He exhibited good flexion and extension in the cervical spine, but with decreased rotation (more limited on the right).  (Tr. 1201.)  He had some reduced range of motion with pain in the right shoulder and some reduced range of motion with crepitus but without pain in the left shoulder.  (*Id.*)  There was tenderness and swelling in the left hand, but his grip strength was 5/5 with mild limitations in flexion in the left index finger.  (*Id.*)  His grip strength was 5/5 in the right hand with no tenderness or swelling.  (*Id.*)  He had a good range of motion in the elbows, knees, and ankles bilaterally.  (*Id.*)  There was "[n]egative MT squeeze bilaterally" in the feet.  (*Id.*)  The "bilateral [fifth] toes subluxed under [fourth] toes."  (*Id.*)   Dr. Lang stated: "Not a slam dunk diagnosis (a lot of this is based on his subjective, rather than objective findings), but seems like he has an inflammatory arthritis."  (Tr. 1208.)  Dr. Lang noted that weight loss could help with low back pain and deferred management of the chronic right hip pain to orthopedics.  (*Id.*)

On August 5, 2021, Mr. Thomas returned to Dr. Lang for follow up.  (Tr. 1274-82.)  He continued to report stiffness in the morning in his lower back, between his shoulder blades, and in his ankles.  (Tr. 1277.)  The pain between his shoulder blades was worse over the prior three

weeks.  (*Id*.)  He said his low back always felt tight, like it was "fused together."  (*Id*.)  He

denied joint swelling, but said he still could not flex his left index finger all the way and there

was pain when he tried to do so.  (*Id*.)  He reported that his right hip continued to hurt and that he

had a follow up scheduled with orthopedics.  (*Id*.)  Examination findings were similar to the

findings from the visit in July.  (*Compare* Tr. 1279-80 *with* Tr. 1200-01.)

       **2.**     **Opinion Evidence**

           **i.**     **Consultative Examination**

      On September 28, 2020, Mr. Thomas presented to Vernon Brown, Ph.D., for a

psychological consultative examination conducted via video conferencing.  (Tr. 732-39.)  He

reported that he was applying for disability due to poor balance, fatigue, and vision loss from

MS.  (Tr. 734.)  He denied current or recent mental health treatment.  (*Id*.)  He reported seeing a

psychiatrist once for relationship issues when he was getting divorced, where he "vented for

about 30 minutes and felt better and did not require any more treatment."  (*Id*.)  His mental status

examination findings were generally unremarkable, except he was "digressive and required

frequent redirection," he "exhibited slightly pressured speech," and "the quality of his speech

was suggestive of heightened anxiety more than hypomania."  (Tr. 735-37.)  He reported

"significant issues with anxiety" and said that he "worrie[d] a lot about his health and his future."

(Tr. 736.)  He used to have panic attacks, but said he had not had them since his divorce and his

last panic attack was four years earlier.  (*Id*.)   He said he was bothered by crowds and preferred

to stay home and not be around people, but also said he was "very tolerant of people."  (*Id*.)  He

said that he did not get mad often, but if he did get angry it was "scary."  (*Id*.)

      As far as activities of daily living, Mr. Thomas reported that he liked to sit outside alone.

(Tr. 737.)  He had several projects around the house, and he watched television a lot.  (*Id*.)  His

mother did the cleaning.  (*Id*.)  He helped with cooking and doing the laundry.  (*Id*.)  He
belonged to the American Legion, but he said he did not have regular activities.  (*Id*.)  He fished
but said that he could no longer hunt because of his vision problems.  (*Id*.)  He said he had
friends that visited, but no one was visiting due to COVID.  (Tr. 738.)

Dr. Brown diagnosed Mr. Thomas with adjustment disorder with mixed anxiety and
depressed mood.  (Tr. 738.)  Dr. Brown opined that Mr. Thomas's ability to understand,
remember, and carry out instructions and his ability to maintain attention and concentration in
order to perform simple and complex tasks were "grossly intact."  (*Id*.)  Dr. Brown further
opined that Mr. Thomas's ability to respond appropriately to supervisors and coworkers in a
work setting was "presumably intact," noting that Mr. Thomas interacted appropriately during
the interview and reported no problems getting along with others when he was working.  (Tr.
739.)  Dr. Brown opined that Mr. Thomas's ability to respond appropriately to pressures in a
work setting was "significantly impaired by [his] current levels of depression and anxiety."  (*Id*.)

### ii.    State Agency Reviewers

On October 7, 2020, state agency medical consultant Abraham Mikalov, M.D.,
completed a physical RFC assessment.  (Tr. 77-78, 85-86.)  Dr. Mikalov opined that Mr. Thomas
had the physical residual functional capacity to lift and/or carry twenty pounds occasionally and
ten pounds frequently; he could never climb ladders/ropes/scaffolds; he could occasionally
balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; he could frequently reach in front,
laterally, and overhead on the right side; and he needed to avoid unprotected heights, dangerous
machinery, and commercial driving.  (*Id*.)  Also, on October 7, 2020, state agency psychological
consultant Kristen Haskins, Psy.D., reviewed the file and opined that Mr. Thomas had no severe
mental impairments.  (Tr. 75-76, 83-84.)

11

On reconsideration, on January 10, 2021, state agency medical consultant Leon Hughes, M.D., and state agency psychological consultant Carl Tishler, Ph.D., affirmed the findings and opinions of Drs. Mikalov and Haskins.  (Tr. 92-93, 94-95, 100-01, 102-103.)

**C.    Plaintiff's Function Report**

A "Function Report – Adult" was completed on behalf of Mr. Thomas on July 28, 2020. (Tr. 229-36.)  Mr. Thomas reported that he had "poor vision that [made] it impossible to drive or do detailed work" and "fatigue that limit[ed] his ability to work" (Tr. 229).  During the day he watched television and sat outside.  (Tr. 230.)  If he was having a good day, he said he might do a "little yardwork." (*Id*.)  He had a son but could not care for him.  (*Id*.)  He reported that his impairments prevented him from working as a carpenter and laborer, and from hunting and fishing as he had in the past.  (Tr. 230, 233.)  He had problems sleeping due to pain and said that he slept during the days at times.  (Tr. 230.)  He had some problems taking care of his personal care needs, including difficulty putting on his pants and boots, trimming his mustache, and getting to the bathroom on time.  (*Id*.)  He could cook and do laundry, but he reported that his mother did most of the cooking.  (Tr. 231.)  If he did not do housework or yardwork, it was because of his fatigue.  (*Id*.)  He shopped for groceries twice a week for about an hour but someone had to drive him.  (Tr. 232.)  He spent time with friends twice a week.  (Tr. 233.)  He said he no longer went to the American Legion because of his impairments.  (*Id*.)  He reported that his impairments affected his ability to: lift, squat, bend, stand, walk, kneel, hear, see, complete tasks, concentrate, and use his hands.  (Tr. 234.)  He estimated he could walk 100 yards before he would need to stop and rest for five minutes.  (*Id*.)  He said he could follow written instructions well if he could see the instructions and he could follow oral instructions "very well." (*Id*.)  He reported no problems getting along with authority figures.  (*Id*.)

12

**D.    Hearing Testimony**

**1.    Plaintiff's Testimony**

At the hearing on June 9, 2021, Mr. Thomas testified in response to questioning by the ALJ and his counsel.  (Tr. 40-58.)  He reported living in a two-story home with his mother.  (Tr. 40-41.)  His bedroom and bathroom were located in the basement.  (Tr. 40.)  It was sometimes difficult for him to go up and down the stairs.  (*Id*.)  He had to take gabapentin in the morning before he started moving in order to be more comfortable.  (*Id*.)  His mother did not need any assistance from him.  (Tr. 41.)  She drove him to most of his appointments because he had not driven since February 2020, about a month before he was diagnosed with MS.  (*Id*.)

Mr. Thomas reported that most of his pain was in his pelvic region, hips, and lower back.  (Tr. 45-46.)  He rated his pain as usually a seven throughout the day.  (Tr. 46.)  There were times during the day that his pain subsided, but he also said that there were times he wanted to cry because the pain was "just unbelievable, especially at night" when he tried to sleep.  (*Id*.)  He estimated getting "about six hours of broken sleep" at night and said he napped during the day.  (*Id*.)  The pain in his right shoulder made it difficult for him to reach his right arm up over his head or put a shirt on over his head, but he could reach out in front with his right arm.  (Tr. 49-50, 57.)  He said that he had neuropathy in his hands and feet.  (Tr. 53, 56-57.)  His hands did not hurt that bad, but they tingled all the time and affected his fine manipulation and grasping abilities.  (*Id*.)  At times it was extremely painful for him to walk due to the neuropathy in his feet.  (Tr. 53.)  He did not have compression stockings or special shoes to help with the neuropathy in his feet.  (*Id*.)  His medication helped "pretty well," but it took "a little bit of time in the morning" for it to start working.  (*Id*.)

13

Mr. Thomas discussed problems that he had with his vision.  (Tr. 50.)  He wore glasses to help with reading, but things were still blurry due to the lesion on his optic nerve.  (*Id.*)  When he watched television, things were blurry on the right, but his left eye was "still really good[.]"  (*Id.*)

Mr. Thomas estimated that he had an MS flare up twice a month (Tr. 46), explaining that a flare up could last from two days to a week (Tr. 47).  When he had a flare up, there were days that he could not leave his house.  (Tr. 56.)  He said heat could cause an MS flare up.  (Tr. 46.)  He reported that Aubagio, which he took to help with his MS symptoms, caused side effects, including stomach problems and anxiety.  (Tr. 47.)

Mr. Thomas was also diagnosed with depression and anxiety.  (Tr. 50.)  His depression did not cause him to have crying spells, but he said it affected his motivation to do things or get going at times.  (Tr. 56.)  However, he also said he was running for a position on the Legion Board.  (*Id.*)  His anxiety caused panic attacks, which he said occurred at least once a month and usually lasted fifteen to twenty minutes.  (Tr. 50-51.)  To help himself through a panic attack, he used breathing exercises and a stretching routine to help him focus on something other than the panic attack.  (Tr. 51.)  He reported heart problems in the past, explaining that he survived a heart attack in 2016.  (Tr. 57.)  A recent stress test had been good, but he said the heart attack still affected him mentally, explaining that that once you have a heart attack, "any time you have a pain in your chest or something," you think you are going to have another one.  (Tr. 57-58.)

Mr. Thomas said he could stand for one to two hours and could walk about a mile before he would need to take break.  (Tr. 47-48.)  He acknowledged telling his doctor at the VA that he was "very active" and got "more exercise than most healthy people."  (Tr. 48.)  He explained that he did not let his situation "bring [him] down too much" and said that he was "still in pretty physically good shape except for the arthritis."  (*Id.*)  He said: "I try to keep pushing on.  That's

basically what I do.  I'm not ready to give up."  (*Id*.)  He said he "constantly work[ed] around the house" and walked a little over a mile to the American Legion about twice a week, usually stopping halfway at a coffee shop.  (Tr. 48-49.)  He knew the owner of the coffee shop and usually talked to everyone at coffee shop.  (Tr. 51.)  He said: "I talk to everybody."  (*Id*.)  He had a best friend and saw him on a regular basis (*id*.) and had been helping his best friend out for about a month since he sold his house and was moving (Tr. 52). He was also friends with his neighbors, but they did not regularly see each other unless someone needed help.  (Tr. 51-52.)

On typical day, Mr. Thomas took his gabapentin even before getting out of bed to help with the neuropathy in his feet.  (Tr. 52.)  Once he got going, he usually showered and then headed outside to work in the yard.  (*Id*.)  He did not like to be inside his house, and said he was usually outside until it was dark and just kept moving.  (*Id*.)  However, he also said that he had to take breaks at least twice during the day to lie down, take another dose of gabapentin, and regroup.  (Tr. 55.)

When the ALJ asked Mr. Thomas what prevented him from working, he stated:

Pain, arthritis, a memory thing that has to do with my MS.  Fatigue. A lot of fatigue. Memory is a big part of it.  And just the physical part of -- getting up and getting into my truck in the morning sometimes is -- would be -- is just overbearing.

(Tr. 45.)  Even though he was "a fairly active person" and tried to "keep moving," he said he would not be able to complete a workday because of the pain in his feet and hip, and mainly because the problems with his feet would make it very difficult to be on time in the morning on a regular basis.  (Tr. 54-55.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 58-66.)  The VE classified two jobs as past work.  (Tr. 60.)  The first job was heavy equipment operator, a skilled job that was

15

generally performed at the medium level but was performed by Mr. Thomas at the very heavy level.  (*Id*.)  The second job was a composite job, consisting of: excavating supervisor, a skilled job that was generally performed at the light level, but was performed by Mr. Thomas at the very heavy level; and heavy equipment operator, a skilled job that was generally performed at the medium level, but was performed by Mr. Thomas at the very heavy level.  (*Id*.)

The VE testified that a hypothetical individual of Mr. Thomas's age, education and work experience and the functional limitations described in the ALJ's RFC determination could not perform Mr. Thomas's prior work, but could perform representative positions in the national economy, including collator operator, cafeteria attendant, and housekeeping cleaner.  (Tr. 61-63.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[2]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his September 7, 2021 decision, the ALJ made the following findings:[3]

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2022.  (Tr. 15.)

2.      The claimant has not engaged in substantial gainful activity since October 31, 2017, the alleged onset date.  (*Id*.)

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[3] The ALJ's findings are summarized.

3.  The claimant has the following severe impairments: lumbar, thoracic and cervical degenerative disc disease; osteoarthritis of multiple joints including bilateral hips, bilateral shoulders, bilateral hands and left foot; multiple sclerosis (MS); optic neuritis due to MS and presbyopia with visual disturbance / bilateral visual field loss; paresthesia of skin; anxiety; depression; and adjustment disorder with mixed anxiety and depressed mood.  (Tr. 16.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16-17.)

5.  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except: he can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; he can frequently push, pull and reach with the right upper extremity, and can frequently handle with the bilateral upper extremities; he can only occasionally perform job tasks that require precise near acuity (for example threading a needle or reading fine print), but can on his own avoid ordinary workplace hazards such as boxes on the floor, doors ajar and approaching people and vehicles; he must avoid concentrated exposure to extreme cold, extreme heat and vibrations; he must avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving; he can perform a wide variety of both simple and complex tasks, but cannot perform tasks that require a high production rate pace such as assembly line work; and he can respond appropriately to occasional change in a routine work setting.  (Tr. 17-23.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 23.)

7.  The claimant was born in 1968 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.) He subsequently changed age category to closely approaching advanced age.  (*Id*.)

8.  The claimant has at least a high school education.  (*Id*.)

9.  Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including collator operator, cafeteria attendant, and cleaner, housekeeping.  (Tr. 23-24.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from October 31, 2017, through the date of the decision. (Tr. 24.)

## V.    Plaintiff's Arguments

Mr. Thomas presents two assignments of error.  First, he argues that the ALJ failed to properly evaluate his subjective symptoms in accordance with SSR 16-3p.  (ECF Doc. 9, pp. 9-16.)  Second, he argues that the ALJ's finding that he had the RFC to perform work at the light level of exertion lacked the support of substantial evidence.  (*Id*. at pp. 16-19.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Properly Considered Subjective Symptoms**

In his first assignment of error, Mr. Thomas argues that the ALJ failed to properly evaluate his subjective symptoms as required by SSR 16-3p. (ECF Doc. 9, pp. 9-16.) He asserts that the ALJ failed to take evidence of limitations caused by his MS and arthritic impairments into consideration and "failed to articulate any supportable rationale" for finding Mr. Thomas's

20

statements not entirely consistent with the record.  (*Id*. at pp. 14-16.)  The Commissioner responds that the ALJ adhered to the procedures for evaluating Mr. Thomas's subjective complaints and did not ignore Mr. Thomas's complaints or other evidence when evaluating Mr. Thomas's subjective complaints. (ECF Doc. 13, pp. 5-12.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, Evaluation of Symptoms in Disability Claims, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 18), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).

*See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Those factors include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ considered Mr. Thomas's allegations that he could not work due to the combination of the symptoms caused by his physical and mental impairments, including pain, fatigue, memory, blurry vision, and anxiety.  (Tr. 18.)  Nevertheless, he found that Mr. Thomas's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 18-19.)

Mr. Thomas argues to the contrary that his "complaints and statements regarding his MS symptoms [and arthritic impairments] . . . were consistent with and supported by the evidence and testimony in this matter."  (ECF Doc. 9, pp. 13-14.)  But this argument does not align with the governing legal standard.  Even if a preponderance of the evidence supported a finding that Mr. Thomas's subjective complaints were consistent with the evidence, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

Mr. Thomas further argues that the ALJ: did not comply with the requirements of SSR 16-3p because he did not adequately consider the limited nature of Mr. Thomas's daily activities and the difficulties resulting from his MS-related vision deficits, fatigue, and pain (ECF Doc. 9, pp. 13-15); and failed to "articulate any supportable rationale for his finding that [Mr.] Thomas's statements . . . were not entirely consistent with the medical evidence" (*id* at p. 14).

The Court finds that Mr. Thomas has not met his burden to show that the ALJ's analysis of his subjective complaints failed to articulate a supportable rationale or failed to meet the

regulatory standard.  A review of the decision reveals that the ALJ considered and accounted for Mr. Thomas's complaints of MS-related vision deficits (Tr. 19), fatigue (Tr. 18-20), and pain (Tr. 18-21), but concluded that he could perform a reduced range of light work consistent with the state agency medical consultants' opinions (Tr. 17, 22-23), with the following additional limitations: "frequent handling with the bilateral upper extremities due to pain/stiffness, occasional tasks that require precise near acuity due to optic neuritis but relatively normal vision exams, and no concentrated exposure to temperature extremes that can flare MS" (Tr. 23).

Consistent with SSR 16-3p, the ALJ considered various factors when evaluating the consistency of Mr. Thomas's subjective statements with the evidence in the record, including his daily activities, the types and effectiveness of his medications, treatments he undertook to address his symptoms, and other factors.  *See* SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).  For instance, the ALJ recognized Mr. Thomas's visual deficits, but observed that those deficits improved with treatment.  (Tr. 19.)  He also observed that Mr. Thomas's reported levels of pain improved with the use of gabapentin.  (*Id.*)  And the ALJ acknowledged Mr. Thomas's complaints of fatigue, but noted his report that the more limiting occurrences of fatigue were "much more frequent" *before* his MS diagnosis and treatment.  (*Id.*)

The ALJ considered Mr. Thomas's complaints of pain and fatigue in light of: objective imaging that reflected degenerative changes and moderate to advanced osteoarthritis in the right hip (Tr. 20-21), degenerative changes in the right shoulder (Tr. 20), and mild to moderate degenerative changes in the spine, hands, and left foot (Tr. 20-21); and abnormal examination findings like limited range of motion in the shoulders and right hip, limited tandem gait, trace pitting edema in ankles (Tr. 19-21).  But the ALJ observed that examinations largely revealed normal findings like full strength, normal gait, and intact coordination and sensation.  (*Id.*)

The ALJ also considered that Mr. Thomas was not using pain medication (Tr. 21), had not followed through with physical therapy and orthopedic referrals (Tr. 20-21), and that his daily activities reportedly included: walking seven miles hiking in the woods; working outside in his yard; walking 1.3 miles twice a week to the American Legion; caring for his own personal needs; cooking, doing laundry, and grocery shopping; and running for a board position at the American Legion.  (Tr. 17, 22.)  Finally, the ALJ considered the relevant medical opinion evidence, finding the state agency medical consultants' opinions that Mr. Thomas could perform light work with occasional postural tasks, limited climbing, frequent overhead reaching with the right upper extremity, and no exposure to hazards to be "generally persuasive and supportable," explaining that the proposed limitations were:

> consistent with the conservative treatment, the good response to medication for MS, and the clinical and objective evidence cited throughout this decision including good strength, normal gait, and good use of the hands. The claimant did not follow recommended treatment such as physical therapy, because he "doesn't have time for PT." He further indicated he walked 7 miles hiking through the woods in May 2021, which is consistent with the ability to perform light work. [] The claimant admits to working outside in his yard and walking to a local business.

(*Id*. Tr. 22 (citations omitted).)

For the reasons set forth above, the Court finds that the ALJ appropriately considered the relevant evidence, complied with SSR 16-3p in considering the factors set out in 20 C.F.R. § 404.1529(c), and sufficiently articulated his rationale for finding Mr. Thomas's subjective statements were not entirely consistent with the medical and other evidence of record. [4] Accordingly, the Court finds Mr. Thomas's first assignment of error to be without merit.

---

[4] Mr. Thomas summarized evidence relating to his mental impairments in connection with his first assignment of error (ECF Doc. 9, p. 13), but failed to adequately develop any challenge to the ALJ's consideration of his mental health symptoms, and any such argument is accordingly waived.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

**C.      Second Assignment of Error: Whether Light RFC Is Supported by Substantial Evidence**

In his second assignment of error, Mr. Thomas argues that the RFC lacks the support of substantial evidence because the ALJ failed to account for Mr. Thomas's MS-related vision problems, fatigue, and pain in concluding that he had the RFC to perform light exertional work. (ECF Doc. 9, pp. 16-19.)  The Commissioner asserts that the arguments in Mr. Thomas's second assignment of error are similar to those in the first assignment of error, and argues that Mr. Thomas has failed to show that the ALJ overlooked evidence regarding his complaints of fatigue or pain.  (ECF Doc. 13, pp. 12-13.)  The Commissioner also argues that Mr. Thomas has failed to show that the ALJ's RFC finding lacks the support of substantial evidence.  (*Id.*)

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

The ALJ concluded that Mr. Thomas had the RFC:

> to perform light work . . . except: He can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  He can frequently push, pull and reach with the right upper extremity.  He can frequently handle with the bilateral upper extremities.  The claimant can only occasionally perform job tasks that require precise near acuity (for example threading a needle or reading fine print), but can on his own avoid ordinary workplace hazards such as boxes on the floor, doors ajar and approaching people and vehicles.  He must avoid concentrated exposure to extreme cold, extreme heat and vibrations.  The claimant must avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving.  He can perform a wide variety of both simple and complex tasks, but cannot perform tasks

25

that require a high production rate pace such as assembly line work.    He can respond appropriately to occasional change in a routine work setting.

(Tr. 17.)

The essence of Mr. Thomas's RFC argument is that his subjective statements regarding the limiting effects of his MS-related vision problems, fatigue, and pain support a more restrictive RFC than that formulated by the ALJ.  (ECF Doc. 9, pp. 17-20.)  He contends that the ALJ failed to consider evidence documenting his MS or his "repeated complaints of fatigue," which he asserts "affected his ability to stand/walk and engage in work at the light level of exertion on a full-time and sustained basis."  (*Id*. at p. 18.)  He also contends that the ALJ did not properly consider his allegations of pain in his back and joints, allegations that he asserts are supported by the record and which support his assertion that that pain interferes with his ability to stand/walk for six hours a day as required for light level exertion work and his testimony that he "could only stand for an hour or maybe two hours with a break" due to his pain.  (*Id*.)

The Court finds Mr. Thomas's arguments to be without merit.  First, his argument is in essence a second challenge to the ALJ's evaluation of his subjective statements.  As explained in Section VI.B, *supra*, "[a]n ALJ is not required to accept a claimant's subjective complaints." *Alexander*, 2021 WL 4459700, at *13 (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  The Court found the first assignment of error to be without merit and will not revisit those findings herein.

Second, the ALJ did not ignore or fail to consider Mr. Thomas's MS-related vision problems or fatigue.  Nor did he fail to consider Mr. Thomas's pain.  The ALJ's decision makes it clear that this evidence was considered.  (Tr. 16, 18-23.)  At Step Two, the ALJ found that Mr. Thomas's severe impairments included: osteoarthritis of multiple joints including the bilateral

26

hips bilateral shoulders, bilateral hands, and the left foot; MS; and optic neuritis due to MS and presbyopia with visual disturbance / bilateral visual field loss.  (Tr. 16.)  At Step Four, the ALJ detailed Mr. Thomas's treatment history, which included treatment at the VA for joint pain and fatigue, treatment at NeuroCare for MS, pain management treatment, and a rheumatology consultation.  (Tr. 19-21.)  In doing so, the ALJ repeatedly acknowledged Mr. Thomas's subjective reports of pain and fatigue during the relevant period, including reports that:

- He had chronic back and widespread joint pain; (Tr. 18)
- His pain was the worst (level 7/10 average) in the pelvic region and lower back; (*id.*)
- His highest level of pain was at night; (*id.*)
- His shoulder pain prevented him from getting items off the top shelf at stores; (*id.*)
- Dressing himself was difficult due to shoulder pain; (*id.*)
- He needed to take medication before he could walk up the stairs; (*id.*)
- His MS caused fatigue and memory problems; (*id.*)
- He was tolerating his MS medication (Aubagio) but he felt fatigued;  (Tr. 19)
- He had pain in his ankles in the morning, but it subsided after ten minutes; (*id.*)
- His vision was improving but he still used reading glasses; (*id.*)
- He was "super fatigued and foggy" two or three times per month and unable to do anything, but the symptoms were "much more frequent" before his MS diagnosis; (*id.*)
- He had issues with balance, fatigue, and "extreme fatigue after he works too much for several days"; (*id.*)
- He had pain in his shoulders, numbness in his hands, and pain in his right hip; (Tr. 20)
- He had bilateral shoulder pain, ankle/feet pain in the mornings "like fire," left elbow pain, and fatigue that "starts in his spine"; (*id.*)
- He had right hip pain, but it improved with weight loss and activity; (*id.*) and
- He had right hip pain for fifteen years (*id.*).

Mr. Thomas's conclusory argument that the ALJ failed to consider evidence documenting his MS, vision problems, pain, or fatigue is unsupported and without merit.

Mr. Thomas's citations to *Smalcer v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01033-CAB, 2022 WL 2079377 (N.D. Ohio May 24, 2022*), report and recommendation adopted sub nom. Smalcer v. Comm'r of Soc. Sec.*, No. 1:21CV1033, 2022 WL 2073806 (N.D. Ohio June 9, 2022) and *Lynch v. Comm'r of Soc. Sec.*, No. 1:20-CV-1728-BYP, 2021 WL 4556247 (N.D. Ohio Sept. 20, 2021), *report and recommendation adopted sub nom. Lynch v. Kijakazi*, No. 1:20CV1728, 2021 WL 4553089 (N.D. Ohio Oct. 5, 2021) (ECF Doc. 9, p. 18) do not change this analysis.  The court in *Smalcer* found the ALJ erred by finding that recent records lacked reports of fatigue when most of the recent records showed consistent complaints of fatigue.  *See* 2022 WL 2079377, at *6.  The court in *Lynch* found the ALJ erred by mischaracterizing physical examination findings as normal when they were abnormal and failing to acknowledge pertinent evidence that included five months of functional assessments.  *See* 2021 WL 4556247, at *9-10. Here, Mr. Thomas has failed to demonstrate that the ALJ mischaracterized or otherwise failed to acknowledge any pertinent records or findings.  The cases cited are inapposite.

Third, although the ALJ concluded that Mr. Thomas's subjective statements were not entirely consistent with other evidence of record, he nevertheless accounted for RFC limitations relating to his MS-related vision problems, fatigue, and pain.  Consistent with the only medical opinions of record regarding Mr. Thomas's physical limitations, the ALJ limited Mr. Thomas to a reduced range of light work (Tr. 17-18, 22-23), but found that the record supported "additional limitations such as frequent handling with the bilateral upper extremities due to pain/stiffness, occasional tasks that require precise near acuity due to optic neuritis but relatively normal vision exams, and no concentrated exposure to temperature extremes that can flare MS."  (Tr. 23.)  Mr. Thomas's argument that the ALJ failed to account for limitations caused by his MS or pain is thus clearly unsupported and without merit.

28

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406.  Even if substantial evidence supports Mr. Thomas's position, the Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  For the reasons explained above, the Court finds that the ALJ did not ignore evidence or fail to account for limitations caused by Mr. Thomas's MS, vision problems, fatigue, or pain when assessing Mr. Thomas's RFC.  The Court further finds that the ALJ's light RFC has the support of substantial evidence.  Accordingly, the Court finds Mr. Thomas's second assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.


August 28, 2024


/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge